DONALD VALDEZ, Appellant, *v.* EMPLOYERS INSURANCE COMPANY OF NEVADA, a Mutual Company, Respondent.

No. 44507

June 28, 2007                                    162 P.3d 148

*Nancyann Leeder*, Nevada Attorney for Injured Workers, and *Cory A. Santos*, Deputy Attorney for Injured Workers, Carson City, for Appellant.

*Beckett, Yott & McCarty* and *Laurie A. Yott*, Reno, for Respondent.

Before the Court En Banc.

## OPINION ON REHEARING

By the Court, Gibbons, J.:

We previously issued an opinion in this matter on November 9, 2006. After appellant petitioned for rehearing, we withdrew that opinion and granted the petition for rehearing. We now issue this opinion in place of our prior opinion. On rehearing, we reach the same conclusion as in our prior opinion.

In this case, an injured worker's 1987 disability claim was originally covered by Nevada's now-defunct workers' compensation insurer. The successor insurer has contracted with a managed-care organization to which the injured worker's treating physician does not belong. The successor insurer consequently instructed the injured worker that, under NRS 616C.090, he must submit to a change in treating physicians and must select a physician who belongs to the contracted managed-care organization. NRS 616C.090, which was enacted in 1993, provides that an injured employee must select a treating physician under the terms of the contract between the employer's insurer and the managed-care organization. The injured worker challenges the successor insurer's directive. Because we conclude that NRS 616C.090 is procedural and remedial, it applies retroactively to the injured worker's 1987 claim for permanent total disability benefits. Therefore, the injured worker must submit to a change in treating physicians in accord with the managed-care organization contract, and we affirm the district court's order denying judicial review.

### FACTUAL BACKGROUND

In 1987, appellant Donald Valdez was severely injured in a work-related motor vehicle accident, which rendered him a quad-

riplegic. As a result, he is confined to a wheelchair, permanently catheterized, and experiences chronic urological problems requiring continuous care by a urologist. The Nevada State Industrial Insurance System (SIIS) initially covered Valdez's workers' compensation claim. In 1996, Valdez began treatment with Dr. Steven Kurtz, a urologist then under contract with SIIS's managed-care organization (MCO) provider network. Dr. Kurtz's office was located approximately one mile from Valdez's home.

The Legislature privatized SIIS in 1999.[1] The resulting entity, Employers Insurance Company of Nevada (EICON), subsequently assumed responsibility for Valdez's claim. In 2002, EICON changed its MCO provider network, contracting with Care Network, Inc. (CNI). Dr. Kurtz was not a member of CNI's provider network. Consequently, EICON notified Valdez that he must choose a new urologist from within CNI's network.

Although the record suggests that Valdez contacted EICON and selected a new urologist, Valdez nevertheless objected to the transfer of care and requested a hearing before the Nevada Department of Administration. Valdez appeared without counsel and testified before the hearing officer. Dr. Kurtz also submitted a statement to the hearing officer that he would accept lower payments under EICON's fee schedule to continue treating Valdez. The hearing officer issued a decision, finding that Valdez's special circumstances warranted reversal and determining that EICON must permit Valdez to continue treatment with Dr. Kurtz. EICON appealed that decision to an appeals officer.

After briefing on the issues of transfer of care and physician choice, the appeals officer filed an amended decision reversing the hearing officer's decision, concluding that the issue of physician choice was procedural and therefore the provisions of NRS Chapter 616C applied retroactively to Valdez's 1987 claim. Absent an emergency exception under NRS 616C.090(4), the appeals officer concluded, NRS 616C.090(3) mandated that Valdez choose a physician from within the CNI provider network. Valdez then filed a petition in the district court for judicial review of the appeals officer's decision. The district court denied Valdez's petition, and this timely appeal followed.

## DISCUSSION

Valdez contends that an injured worker's choice of a physician is a substantive right to compensation and benefits that the Legislature may not retroactively abrogate. According to Valdez, his ''right'' to choose his treating physician vested on the date of his injury in 1987. Thus, Valdez contends, subsequent legislative enactments requiring an injured worker to choose his treating physi-

---

[1]1999 Nev. Stat., ch. 388, at 1756-1844.

cian under the terms of EICON's managed-care contract do not apply to workers' compensation claims that accrued before the legislation was enacted. We disagree and conclude that the legislation applies to Valdez's claim because Valdez has no substantive right to choose his physician, since the legislation is procedural and remedial.

*Standard of review*

This appeal requires us to examine the meaning of several workers' compensation statutes. Because statutory construction is a question of law, our review of an administrative ruling concerning the application of a statute is plenary, rather than deferential.[2] When a statute's language is plain and unambiguous, we will give that language its ordinary meaning.[3] When, however, a statute may be given more than one reasonable interpretation, it is ambiguous.[4] When an ambiguous statute is construed, it should be given a meaning that is consistent with what the Legislature intended, based on reason and public policy.[5]

*History of managed care in the workers' compensation context*

We first summarize briefly the history of managed care in Nevada's workers' compensation laws. The Nevada Legislature first enacted comprehensive no-fault workers' compensation legislation in 1911 to enable workers injured on the job to obtain compensation for medical care without resorting to common-law tort remedies.[6] In 1973, the Legislature amended the workers' compensation statutes, directing the administrator of workers' compensation, the Nevada Industrial Commission, to appoint a statewide panel of physicians specializing and competent in occupational health to treat workers injured on the job.[7] Under the amendments, an injured worker could choose his treating physician from this panel,[8] and the Commission could add, suspend, or remove panel physicians.[9] Although the Commission would pay claims for medical treatment by panel physicians out of the state's workers' compensation fund, it would not cover treatment by physi-

[2]*Maxwell v. SIIS*, 109 Nev. 327, 329, 849 P.2d 267, 269 (1993).

[3]*Banegas v. SIIS*, 117 Nev. 222, 225, 19 P.3d 245, 247 (2001).

[4]*Id.*

[5]*Id.*

[6]*See Virden v. Smith*, 46 Nev. 208, 210, 210 P. 129, 129 (1922).

[7]1973 Nev. Stat., ch. 762, § 3(1), at 1595.

[8]*Id.* § 3(2).

[9]*Id.* § 3(4).

cians not appointed to the panel.[10] If an injured employee was not satisfied with his original choice of physician, the employee could choose another physician from the panel, subject to the Commission's approval.[11] These provisions were codified as former NRS 616.342.

This statewide physician panel and benefits scheme remained largely intact until 1993, when the Legislature enacted Senate Bill (S.B.) 316, permitting SIIS (the Commission's successor) to contract with MCOs to provide comprehensive medical services for injured workers whose employers were insured by SIIS.[12] Under S.B. 316, a self-insured employer also could contract with an MCO and could require an injured employee to obtain medical treatment for work-related injuries from the contracting MCO.[13] In turn, the MCO was to ensure available, accessible, and adequate treatment to injured workers.[14]

S.B. 316 also made important changes to physician choice. The Legislature directed the Administrator of the Nevada Department of Business and Industry's Division of Industrial Relations (DIR) to manage the statewide physician panel.[15] Insurers and self-insured employers that had not entered into managed-care contracts were still to make available to their employees the list of physicians appointed to the statewide panel.[16] And the Legislature retained the Administrator's authority to remove a physician from the panel for good cause.[17] Under this statutory scheme, which continues to be effective, if the DIR removed a physician from the statewide panel, an insurer or self-insured employer could not pay the physician for medical care provided to an injured employee after the date of the physician's removal.[18]

---

[10]*Id.* § 3(3).

[11]*Id.* § 3(2).

[12]1993 Nev. Stat., ch. 265, § 74, at 687. In 1995, the Legislature authorized private insurance carriers to enter into managed-care contracts. 1995 Nev. Stat., ch. 580, § 72, at 2019 (codified as amended at NRS 616B.527(1)(a)).

[13]1993 Nev. Stat., ch. 265, § 78, at 690-91 (codified as amended at NRS 616B.527(1)(c)).

[14]*Id.* § 75, at 688; *id.* § 78, at 690 (currently codified at NRS 616B.5273(1)(a)).

[15]1993 Nev. Stat., ch. 265, § 140, at 713 (codified as amended at NRS 616C.090(1)-(2)); NRS 616A.040; NRS 616A.100.

[16]1993 Nev. Stat., ch. 265, § 140, at 713-14 (codified as amended at NRS 616C.090(1)).

[17]*Id.* § 140(5).

[18]*Id.* § 167, at 733 (codified as amended at NRS 616C.055(2)); *see also* NRS 616C.090. EICON's argument that NRS 616C.055(2) prohibits an MCO

Under the 1993 amendments and NRS 616C.090, an injured worker whose employer's workers' compensation insurer has contracted with an MCO "must choose his treating physician . . . pursuant to the terms of that contract."[19] Thus, an employee must choose a physician from among those provided in the MCO's contract. Additionally, MCO network physicians must be DIR panel members.

*Physician choice is not a substantive right*

Valdez contends that Nevada's statutory language defining workers' "compensation" and "benefits" is ambiguous and that we must construe this ambiguity to include physician choice. Thus, Valdez maintains that physician choice is a substantive entitlement. We agree that the key statutory terms are ambiguous as to whether physician choice is a substantive entitlement. However, for the reasons set forth below, we conclude that the Legislature intended that an injured worker's choice of treating physicians be subject to subsequent contracts between EICON and its MCO.

Under NRS 616C.425(1), "[t]he amount of compensation and benefits and the person or persons entitled thereto must be determined as of the date of the accident or injury to the employee, and their rights thereto become fixed as of that date." The term "compensation" is defined in NRS 616A.090 as "the money which is payable to an employee or to his dependents . . . and includes benefits for funerals, accident benefits and money for rehabilitative services." "Accident benefits" are defined in NRS 616A.035(1) as "medical, surgical, hospital or other treatments, nursing, medicine, medical and surgical supplies, crutches and apparatuses, including prosthetic devices." And the term "accident benefits" also includes "[m]edical benefits as defined by NRS 617.130."[20]

---

from paying an out-of-network physician misconstrues the meaning of the word "panel." As used in the statute, "panel" refers to the statewide panel chosen by the Administrator, not the "panel" of in-network physicians under contract with an MCO. Thus, NRS 616C.055(2) does not, as EICON asserts, prohibit out-of-network payments.

Likewise, Valdez's argument that NRS 616C.090(5) prohibits an MCO from dropping physicians from a provider network without good cause misconstrues the statute. NRS 616C.090(5) refers to the Administrator's authority to remove or suspend a physician from the statewide panel for good cause. An MCO's selection of physicians is a matter of contract.

[19]NRS 616C.090(3); *see* 1993 Nev. Stat., ch. 265, § 140, at 713-14 (amending former NRS 616.342).

[20]NRS 616A.035(2)(a).

Compensation, for purposes of the workers' compensation laws, thus includes "medical benefits."[21]

"Medical benefits" are defined in NRS 617.130 as "medical, surgical, hospital or other treatments, nursing, medicine, medical and surgical supplies, crutches and apparatus, including prosthetic devices." The Legislature's definition of accident and medical benefits with the phrase "medical, surgical, hospital or other treatments" is ambiguous as to the scope of the benefits conferred because the phrase is susceptible to more than one reasonable definition. For instance, "medical treatments" may reasonably include only medical diagnoses and procedures. But that phrase could reasonably be defined to include diagnoses and treatment provided by a particular physician. Because the phrase is ambiguous, we must interpret it consistently with what the Legislature intended. The legislative history indicates that when the Legislature privatized SIIS in 1999, it considered physician choice in the context of managed care and excluded physician choice from the scope of "compensation" and "benefits." Prior to that time, any protection of an injured worker's choice of physicians extended only to pre-1993 claimants not yet receiving care under the managed-care system. Specifically, S.B. 316, § 288, which the Legislature enacted in 1993, protected an injured worker's choice of physicians by limiting the circumstances in which an injured worker already receiving services could be required to participate in the managed-care plan.[22] The 1995 Legislature continued that protection of physician choice for pre-1993 claimants. For instance, it enacted S.B. 458, § 6.5, which amended statutory provisions relating to SIIS contracts with MCOs and provided some protection of physician choice for certain injured workers.[23] This provision was subsequently codified at NRS 616B.524.

---

[21]*EICON v. Chandler*, 117 Nev. 421, 426, 23 P.3d 255, 258 (2001).

[22]1993 Nev. Stat., ch. 265, § 288, at 806. S.B. 316, § 288 states:

If the manager of the state industrial insurance system enters into a contract with an organization for managed care . . . , an injured employee who is insured by the system and is receiving medical or health care services for an industrial injury or occupational disease on [June 18, 1993] may not be required to participate in the plan for managed care until he is determined to be medically stable or changes his physician . . . .

[23]1995 Nev. Stat., ch. 587, § 6.5, at 2122. S.B. 458, § 6.5 contained the following language:

1. Any employee . . . [w]ho was injured by an accident arising out of and in the course of his employment before January 6, 1994, and whose claim is open . . . shall participate in a plan for managed care established by [SIIS] in accordance with the regulations adopted for this purpose by the manager [of SIIS].

The legislative debate over and subsequent enactment of S.B. 458 suggest that the Legislature was primarily concerned with preserving pre-S.B. 316 compensation and benefits during the SIIS transition to managed care. However, the Legislature's efforts to transition pre-S.B. 316 workers' compensation claims into the managed-care system in an expedient and efficient manner, while minimizing the hardship to claimants, did not include a provision protecting physician choice other than § 6.5. Testimony before the Senate and Assembly committees acknowledged the hardship a transfer of care might impose upon injured workers, but clear language preserving pre-S.B. 316 physician choice is notably absent from current legislation.

In 1999, the Legislature enacted S.B. 37, privatizing SIIS.[24] S.B. 37 repealed all provisions relating to managed care and SIIS, including NRS 616B.524, *i.e.*, S.B. 458, § 6.5.[25] Because SIIS became a "private carrier," it became subject to the managed-care provision of NRS 616B.527. Statutory provisions protecting physician choice disappeared from the NRS.

Our review of the legislative history to S.B. 458 suggests that Valdez's claim was substantially the type of claim suited for transition to managed care. In fact, in 1996, Valdez began participating in a managed-care plan when he started seeing Dr. Kurtz.[26] We acknowledge that it may be burdensome for Valdez to travel an additional seven miles to seek urological treatment with a new physician. But Valdez is not faced with an emergency, and the Legislature has not adopted a non-emergency "good cause" exception in NRS 616C.090.[27] And we decline to impute one. While the entitlement to competent medical treatment for a work-related injury is

---

2. If the [SIIS] manager enters into a contract with an organization for managed care or renews such a contract on or after July 1, 1995, the contract must require the organization for managed care to provide . . . services to injured employees insured by the system who have not otherwise been required to participate in a plan for managed care. The contract may not require such an injured employee to change from his treating physician . . . to another physician . . . in order to receive compensation or benefits.

[24]1999 Nev. Stat., ch. 388, § 127, at 1836.

[25]*Id.*

[26]We note, without concluding, that even assuming S.B. 316, § 288 was not impliedly repealed in 1999 by S.B. 37, that provision does not apply to Valdez because in 1996, at the latest, he had already transitioned to a managed-care plan when he began receiving treatment from Dr. Kurtz, who was then under contract with SIIS's MCO provider network. Alternatively, Valdez lost any protection afforded by S.B. 316, § 288 when he changed physicians in 1996.

[27]NRS 616C.090(4) provides an exception to the managed-care contract terms for selecting a physician. It applies to emergency medical care:

itself a medical benefit, the choice of one's physician is not.[28] Further, we observe that a judicial construction of the terms "compensation" and "benefits" to include physician choice would unreasonably frustrate a carefully considered, comprehensive legislative scheme adopting managed care as the preferred method of administering workers' entitlement to compensation for and treatment of work-related injuries. We decline to expand these terms without further guidance from the Legislature.

*Medical benefits, compensation, and substantive rights*

We now turn to Valdez's contention that the workers' compensation laws nevertheless conferred upon him a vested, substantive right to choose his treating physician that the Legislature could not retroactively abrogate by adopting the managed-care system. We disagree and conclude that managed care and physician choice are acceptable procedural and remedial mechanisms for administering a vested entitlement. Legislative provisions to that effect are retroactive in the absence of a clear statement of contrary legislative intent. Accordingly, we further conclude that Valdez must submit to a change of physician in accord with EICON's managed-care contract.

Workers' compensation laws are remedial and in derogation of the common law.[29] We construe them neutrally, not liberally in favor of the injured worker.[30] With respect to the application of newly enacted statutes, we generally presume that they apply prospectively unless the Legislature clearly indicates that they should apply retroactively or the Legislature's intent cannot otherwise be met.[31] This general rule does not apply to statutes that do not change substantive rights and instead relate solely to remedies

---

Except when emergency medical care is required and except as otherwise provided in NRS 616C.055, the insurer is not responsible for any charges for medical treatment or other accident benefits furnished or ordered by any physician . . . selected by the injured employee in disregard of the provisions of this section . . . .

[28]Valdez also contends that the appeals officer violated his right to due process by not permitting him to testify at a hearing. While NRS 616C.360(2) requires that the appeals officer hold a hearing on "any matter raised before him on its merits," the facts material to Valdez's claim were not in dispute. And the only matter before the appeals officer was a legal question as to Valdez's right to choose his physician; no testimony was necessary to resolve that question of law.

[29]*Virden v. Smith*, 46 Nev. 208, 211, 210 P. 129, 130 (1922).

[30]NRS 616A.010(2)-(4).

[31]*McKellar v. McKellar*, 110 Nev. 200, 203, 871 P.2d 296, 298 (1994).

and procedure, however; in these instances, a statute will be applied to any cases pending when it is enacted.[32]

■■■■■ ■■ ■

While Valdez's right to receive workers' compensation coverage and treatment is a statutory right that vested on the date of his injury, we conclude that physician choice is a procedural mechanism for implementing a remedial scheme. It is well-established that Valdez has a statutorily created property interest in the continued receipt of workers' compensation benefits that the State may not abrogate without due process under the Fourteenth Amendment to the United States Constitution.[33] Further, Valdez's property interest in receiving these benefits attached once he fulfilled the requirements of his entitlement under Nevada law.[34] However, as we have concluded, physician choice is not part of those benefits. Rather, the manner in which an injured worker may select a physician and any limits on that selection are procedural mechanisms for managing the workers' compensation system. Accordingly, the Legislature could retroactively alter those procedural mechanisms.

## CONCLUSION

We conclude that physician choice under the managed-care system is a procedural and remedial means of administering an injured worker's vested right to workers' compensation. Accordingly, NRS 616C.090(3) applies retroactively to require Valdez to choose a treating physician who is a member of an MCO that has contracted with EICON. Setting aside public policy debates about the convenience, cost, and fairness of a managed-care system, the language of NRS 616C.090 and its legislative history indicate that the Legislature intended to make pre-1993 permanent total disability claims like Valdez's subject to managed-care contracts. Further, we conclude that Valdez's other arguments are without merit. Therefore, we affirm the district court's order denying judicial review of the appeals officer's decision directing a change in physicians.

HARDESTY, PARRAGUIRRE, DOUGLAS, CHERRY and SAITTA, JJ., concur.

---

[32]*Madera v. SIIS*, 114 Nev. 253, 258, 956 P.2d 117, 120 (1998) (quoting *Friel v. Cessna Aircraft Co.*, 751 F.2d 1037, 1039 (9th Cir. 1985)).

[33]*See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (social security disability benefits); *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (welfare benefits).

[34]*See American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59-61 (1999) (concluding that an injured worker's property interest in the payment of medical benefits attached only when his claim met the requirements of Pennsylvania law and not before).

MAUPIN, C. J., concurring:

I agree that a neutral interpretation of our ambiguous workers' compensation statutory scheme compels the result reached by the majority. I write separately to note my continued concern that the neutrality rule embodied in NRS 616A.010(2)-(4) has operated again to the distinct disadvantage of a profoundly injured Nevada worker.[1] Here, a wheelchair-bound quadriplegic must, at the administrative whim of a managed care entity, now see a doctor located miles from his place of residence in order to receive essential medical care.

In short, we are compelled by our oaths of office to enforce this terrible rule.[2]

---

[1]*See Grover C. Dils Med. Ctr. v. Menditto*, 121 Nev. 278, 112 P.3d 1093 (2004).

[2]The neutrality rule was enacted to address the financial decline of the former State Industrial Insurance System. In my view, this rule is no longer necessary now that the Nevada workers' compensation system has been privatized and its successor, the respondent in this case, has become an enormous economic success. The Legislature should revisit this rule in order to bring more fairness to Nevada workers.